Elizabeth Brannen (SBN 226234)
ebrannen@stris.com
John Stokes (SBN 310847)
jstokes@stris.com
Lauren Martin (SBN 294367)
lmartin@stris.com
**STRIS & MAHER LLP**
17785 Center Court Dr N, Ste 600
Cerritos, CA 90703
T: (213) 995-6800
F: (213) 261-0299

Christopher M. Rigali (*pro hac vice*)
crigali@stris.com
Jacqueline Sahlberg (*pro hac vice*)
jsahlberg@stris.com
**STRIS & MAHER LLP**
1717 K St NW Ste 900
Washington, DC 20006
T: (202) 800-5749

Bridget Asay (*pro hac vice*)
basay@stris.com
**STRIS & MAHER LLP**
15 East State Street, Suite 2
Montpelier, VT 05602
T: (802) 858-4285

Kyle Roche (*pro hac vice*)
kroche@fnf.law
Devin (Velvel) Freedman (*pro hac vice*)
vel@fnf.law
Alex Potter (*pro hac vice*)
apotter@fnf.law
**FREEDMAN NORMAND FRIEDLAND LLP**
155 E. 44th Street, Ste 915
New York, NY 10017
T: (646) 494-2900

*Counsel for Plaintiffs*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CAMBRONNE INC., LISA BARRETTA, PHILIP SHISHKIN, JANE ADAMS, MATTHEW SACKS, and MICHAEL KOCHIN,<br><br>       Plaintiffs,<br><br>     v.<br><br>META PLATFORMS, INC.,<br><br>       Defendant. | Civil Case No.: 3:26-cv-03725-VC<br><br><br>**SECOND AMENDED COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

1. Plaintiffs Cambronne Inc., Lisa Barretta, Philip Shishkin, Jane Adams, Matthew Sacks, and Michael Kochin (collectively "Plaintiffs") bring this action against Meta Platforms, Inc. ("Meta" or "Defendant"), and allege as follows:

## I.    INTRODUCTION

2. This case concerns Defendant Meta's exploitation of Plaintiffs' copyrighted works to build its "Llama" family of large language models ("LLMs"). Defendant is in open and active competition with its tech company rivals to win what many have deemed the "generative AI arms race." Participants in this race are under immense pressure to build more, better, and faster, with an eye towards ensuring that *its* generative AI models are widely adopted. Broad adoption of a company's generative AI models will yield great profits, the thinking goes; on the converse, failure to move quickly means missing the boat on this trillion-dollar industry. To remain competitive in this race, Meta turned to notorious online "shadow libraries" and similar pirated datasets to obtain vast quantities of copyrighted materials—books, articles, training materials, and the like—which it desperately wanted to train and optimize its LLM models. Meta could have—*and should have*—paid copyright owners, including Plaintiffs, for licenses to use their copyrighted works in connection with training its Llama models. Instead, Meta fed from, and then back into, the dark market for digitally available copyrighted materials. Ultimately, Meta downloaded, reproduced, distributed, and defaced these copyrighted works, including Plaintiffs' works, to get ahead in the generative AI arms race and improve its bottom line. Plaintiffs bring this action to hold Meta accountable for its brazen acts of copyright infringement.[1]

3. LLMs are a form of "generative artificial intelligence" or "generative AI." These models are designed to process and emit natural language. Over the last several years, many of the world's biggest and wealthiest technology companies have entered the market to develop, distribute, and commercialize generative AI models, believing these and other forms of artificial intelligence have massive potential for growth in revenue and profits. Because artificial intelligence, including

---

[1] Unless otherwise indicated, references to Meta's "Llama" refers to all versions of Llama in any stage of their development or deployment.

generative AI, is viewed by industry leaders as the next foundational layer of the digital economy, the pressure to build more, better, and faster has led to the aforementioned AI "arms race."

4. Against this backdrop, LLM developers needed data upon which to train their models. AI researchers quickly discovered that published content—*e.g.*, books, articles, and training materials—is really the gold standard when it comes to LLM training material. Unlike Internet content and many other forms of text, published material typically is structured, long-form, and highly polished. These materials embody the expressive output of their creators, are thoughtfully planned, and take weeks, months, and years to develop and publish. In simple terms, if you want to teach a machine how to "speak" or write like a human—capable of telling stories, using analogies, and making jokes—feed it material that mimics how we express ourselves in our most articulate and complete forms.

5. For its Llama training datasets, Meta needed gold standard training data. To get its hands on published content, Meta considered and explored the possibility of licensing copyrighted materials for use in its LLM training. The company's head of generative AI even discussed spending up to $100 million on licensing such materials. Ultimately, however, Meta abandoned this idea in favor of a faster and cheaper approach: downloading copyrighted materials from Internet-based "shadow libraries" and other datasets that contained the contents of these shadow libraries. These shadow libraries, each of which contained tens or hundreds of thousands of unauthorized digital copies of copyrighted works, had for years been the subject of criminal prosecutions, civil lawsuits, and widespread warnings within the technology industry. As such, by the time Meta turned to these sources to obtain training material for its Llama models, it knew or should have known that these "libraries" were the beneficiaries and propagators of copyright infringement.

6. To download copyrighted works from these shadow libraries, Meta often torrented them. "Torrenting" works by breaking a file into many small pieces and distributing those pieces across a network of participating computers. A user downloads portions of a file from numerous other computers that already possess the file and software reassembles those pieces into a completed whole on the user's machine.

7.    But torrenting protocols not only facilitate downloading, they also facilitate and encourage uploading. And through Meta's torrenting of copyrighted material from illicit shadow libraries, Meta became a distributor of unauthorized copies of protected works. Stated somewhat differently, Meta used torrenting protocols that facilitated its reuploading of copyrighted materials into peer-to-peer file-sharing networks. In Copyright Act terms, Meta distributed copyrighted materials without consent or authorization. And through this distribution, Meta also contributed to further acts of infringement, allowing other users on these peer-to-peer networks to unlawfully reproduce and distribute copyrighted works.

8.    In addition to ripping pirated copies, reproducing, and distributing without authorization Plaintiffs' copyrighted materials, Meta also stripped these materials of copyright management information, enabling, facilitating, and concealing the infringement of these works. Meta did this to optimize its models' performance.

9.    Adding insult to all of this injury, Meta's use of Plaintiffs' copyrighted materials facilitated Meta's creation of AI models capable of generating content that directly competes with and will compete directly with Plaintiffs' content. "Learning from" the creativity and expression embodied in thousands upon thousands of copyrighted works, including Plaintiffs' works, Llama has the capability to flood the market with free and paid content that vies with Plaintiffs' for consumer attention.

10.    The result of Meta's use of copyrighted materials to train Llama? Meta expects its Llama models to generate somewhere in the realm of $460 billion to $1.4 trillion in revenue. The Copyright Act doesn't allow Meta to get a free ride on the backs of Plaintiffs and the other creators whose copyrighted works it exploited to build its trillion-dollar generative AI models. Plaintiffs bring this action to hold Meta accountable for the infringement that enabled its rise in the generative-AI marketplace, and to enforce the fundamental principle that creative expression cannot be taken, copied, or exploited without permission or compensation.

11.    To redress Meta's repeated, unlawful, and *en masse* infringement of its works, Plaintiffs seek (1) damages, (2) permanent injunctive relief barring Meta's ongoing infringement, and (3) any additional remedies the law provides.

3

SECOND AMENDED COMPLAINT

12.     Plaintiffs elect not to bring this case as a class action because the Copyright Act entitles it to recover individualized statutory damages, determined by a jury, for Meta's infringement and related conduct.  Plaintiffs desire to retain full control of their case and avoid having their rights diluted by being swept into sprawling class-action settlements structured to resolve claims for pennies on the dollar. Recent history has shown that certain class actions and proposed settlement(s) seem to serve the tech conglomerate-infringers, not creators. LLM companies should not be able to so easily extinguish thousands upon thousands of high-value claims at bargain-basement rates, eliding what should be the true cost of their massive willful infringement.

13.     That is not how Plaintiffs plan to proceed. Under established Supreme Court precedent, "the amount of statutory damages is a question for the jury."[2] The Copyright Act thus vests authors with the right to have a jury evaluate the willfulness of infringement and assign a damages amount tailored to the Meta's conduct.

14.     In sum, the Copyright Act's statutory-damages and attorneys' fee regime empowers individual authors and publishers to hold infringers accountable without the need for class action treatment. That is what Plaintiffs have chosen to do.

## II.     PARTIES

### A.     Plaintiffs

15.     Plaintiff Cambronne Inc. is wholly owned by John Carreyrou, who is an author and journalist who resides in New York. He is the author of *Bad Blood: Secrets and Lies in a Silicon Valley Startup*. His work is contained in pirated online libraries, including Books3 (and thus, *The Pile*),  LibGen, Z-Library, and Anna's Archive. Meta has directly or indirectly downloaded books illegally contained in *The Pile*, LibGen, Z-Library, or Anna's Archive and there is accordingly a reasonable inference that Meta illegally downloaded Carreyrou's work.

16.     Plaintiff Lisa Barretta is an author who resides in Pennsylvania. She is the author of *The Street-Smart Psychic's Guide to Getting a Good Reading* and *Conscious Ink: The Hidden Meaning of Tattoos*. Her works are contained in pirated online libraries, including LibGen, Z-

---

[2] *Feltner v. Columbia Pictures Television, Inc.*, 523 U.S. 340, 353 (1998).

Library, and Anna's Archive. Meta has directly or indirectly downloaded books illegally contained in *The Pile*, LibGen, Z-Library, or Anna's Archive, and there is accordingly a reasonable inference that Meta illegally downloaded Barretta's works.

17.     Plaintiff Philip Shishkin is an author and journalist who resides in Washington D.C. He is the author of *Restless Valley: Revolution, Murder and Intrigue in the Heart of Central Asia*. His work is contained in pirated online libraries, including LibGen, Z-Library, and Anna's Archive. Meta has directly or indirectly downloaded books illegally contained in *The Pile*, LibGen, Z-Library, or Anna's Archive, and there is accordingly a reasonable inference that Meta illegally downloaded Shishkin's work.

18.     Plaintiff Jane Adams is an author and journalist who resides in Washington. She is the author of *Boundary Issues: Using Boundary Intelligence to Get the Intimacy You Want and the Independence You Need in Life, Love, and Work* and *How to Sell What You Write*. Her works are contained in pirated online libraries, including LibGen, Z-Library, and Anna's Archive. Meta has directly or indirectly downloaded books illegally contained in *The Pile*, LibGen, Z-Library, or Anna's Archive, and there is accordingly a reasonable inference that Meta illegally downloaded Adams' work.

19.     Plaintiff Matthew Sacks is an author and journalist who resides in California. He is the author of *Pro Website Development and Operations*. His work is contained in pirated online libraries, including LibGen, Z-Library, and Anna's Archive. Meta has directly or indirectly downloaded books illegally contained in *The Pile*, LibGen, Z-Library, or Anna's Archive, and there is accordingly a reasonable inference that Meta illegally downloaded Sacks' work.

20.     Plaintiff Michael Kochin is an author and journalist who resides in Israel. He is the author of *Five Chapters on Rhetoric: Character, Action, Things, Nothing & Art* and *An Independent Empire: Diplomacy & War in the Making of the United States*. His works are contained in pirated online libraries, including LibGen, Z-Library, and Anna's Archive. Meta has directly or indirectly downloaded books illegally contained in *The Pile*, LibGen, Z-Library, or Anna's Archive, and there is accordingly a reasonable inference that Meta illegally downloaded Kochin's work.

21.    A non-exhaustive list of registered copyrights owned by Plaintiffs are included as Exhibit A (herein, the "Plaintiffs' Works").[3]

B.    **Defendant**

22.    Defendant Meta Platforms, Inc. is a Delaware corporation with its principal place of business in Menlo Park, California. Meta develops and distributes the Llama series of LLMs, including Llama 1, Llama 2, Llama 3, and Llama 4, which were trained using datasets sourced in part from shadow libraries and other datasets containing pirated books.

III.    **JURISDICTION AND VENUE**

23.    This action arises under the Copyright Act of 1976, 17 U.S.C. § 101 *et seq*. This Court has subject-matter jurisdiction under 28 U.S.C. §§ 1331 and 1338(a) because Plaintiffs assert claims exclusively under federal copyright law.

24.    This Court has personal jurisdiction over the Defendant. The Defendant has purposefully availed itself of the privilege of conducting business in this District and the State of California. The Defendant committed acts of copyright infringement in this District, directed conduct toward this District, or knowingly caused harm that was suffered in this District. The Defendant maintains substantial, continuous, and systematic contacts with this District.

25.    Venue is proper in this District under 28 U.S.C. § 1400(a) because the Defendant or its agents resides or may be found in this District as a result of the infringing acts alleged herein. Venue is also proper under 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to Plaintiffs' claims—including the acquisition of pirated copies of Plaintiffs' works, the reproduction and ingestion of those copies into Defendant's training pipelines, the training and fine-tuning of the relevant LLMs, and the commercialization of the resulting models—occurred in this District.

---

[3] Even where other individuals or entities are listed as copyright claimants on the relevant copyright registrations, Plaintiffs are legal or beneficial owners of all copyrights listed in Exhibit A.

## IV.    FACTUAL ALLEGATIONS

### A.    Plaintiffs and their Protected Works

26.    Plaintiffs' works span a diverse range of nonfiction genres, including investigative journalism, history, current affairs, self-help, spirituality, technology, rhetoric, and professional education. Authors such as John Carreyrou and Philip Shishkin wrote extensively researched factual works addressing corporate misconduct, geopolitical events, and social issues, while other Plaintiffs authored instructional and educational works concerning relationships, writing, web development, and communication. Collectively, the works reflect substantial original authorship intended to inform, educate, and engage readers on subjects ranging from business and technology to personal development, spirituality, and the humanities.

27.    Plaintiffs have either legal or beneficial ownership of the rights to reproduce, adapt, and distribute Plaintiffs' Works.

28.    According to publicly available metadata, Plaintiffs' Works are contained in pirated online libraries and datasets including Books3 (and thus *The Pile*), Library Genesis or "LibGen," Z-Library, and Anna's Archive. As alleged below, Meta has directly or indirectly downloaded works contained in *The Pile*, LibGen, Z-Library, and Anna's Archive, and there is accordingly a reasonable inference that Meta illegally downloaded and reproduced Plaintiffs' Works.

### B.    LLMs and the Generative AI "Arms Race"

29.    "Generative artificial intelligence" or "generative AI" refers to systems and models that create outputs—such as text or images—that simulate human expression, often in response to user prompts.

30.    Large language models are a form of generative AI, which are designed to process—or "understand"—and generate natural language. At a high level, LLMs operate by studying and "learning" the statistical relationship between words and other text (such as punctuation marks); upon further refinement by their developers, the models then process complex mathematical sequences to "predict" sequences of text based on the statistical relationships it has learned and been trained to recognize.

SECOND AMENDED COMPLAINT

31.    Development of LLMs requires, among other things, "training" the model on data—*i.e.*, the model's inputs. Training "requires identifying a formal measure or 'objective' for how well the model performs, and then repeatedly adjusting the model's parameters based on that objective as the model is exposed to training data."[4] While not all LLM developers use the same terminology, developers commonly reference a "pre-training" process—"in which a massive amount of computing power and data is spent to teach the model the broad foundations of language, grammar, and reasoning"—and a "post-training" or "fine-tuning" process "where the pre-trained model is further trained on a (relative to pre-training) smaller amount of carefully curated data of specific tasks."[5] For purposes of this Complaint, "training" refers to all stages of the LLM training process.

32.    LLMs typically are trained, at least initially, by feeding them massive amounts of text data from which they can "learn" statistical relationships between and among text. In the process of compiling training data and using it during the training process, LLM developers as a matter of course typically create multiple copies of "raw" datasets. So, for instance, if an LLM developer downloads a copy of a digital book from some Internet-based source (*e.g.*, a shadow library), the developer typically will create a new "cleaned" copy of the book (*e.g.*, stripped of certain undesirable data), deduplicate that book against other potential copies, compile that book with other data to create a new compilation (or compilations), and store that book in multiple locations. In short, with respect to training data, the LLM development pipeline typically involves numerous reproductions of any given piece of the dataset.

33.    A model's inputs—the training datasets—are directly tied to the model's performance. As one AI researcher has now famously said, a "model['s] behavior is not determined by architecture, hyperparameters, or optimizer choices. It's determined by your dataset, nothing else."[6]

---

[4] U.S. Copyright Office, *Copyright and Artificial Intelligence, Part 3: Generative AI Training Pre-Publication*, at 17 (May 2025),  https://perma.cc/EY5U-EFUY.

[5] *Id.*

[6] James Betker, *The "it" in AI Models is the Dataset*, (June 10, 2023), https://perma.cc/ZCH9-H53S.

SECOND AMENDED COMPLAINT

34.    In determining the corpus of training data for an LLM, a model's developer typically considers "the quantity of data, its quality, and the ultimate purpose(s) of the model."[7]

35.    In terms of data quantity, the LLMs that have been developed and are being developed by leading technology companies are trained on enormous datasets, typically on the scale of terabytes. This is because AI researchers have found that "increasing the quantity of training data typically increases a model's 'performance.'"[8]

36.    In terms of data quality, "[r]ecent research from major developers suggests that quality may even be a more important consideration than quantity."[9] "Garbage in, garbage out," the saying goes. AI researchers quickly discovered that published content—books in particular—makes for some of the best training material for LLMs. Unlike much content on the Internet and many other forms of text, published material typically is structured, long-form, and highly polished. Published materials provide formal, extended prose that teaches models narrative structure, complex syntax, and coherent storytelling.

37.    That books make for particularly valuable training material for LLMs is evidenced by the fact that several—if not most—of the major LLM developers either have paid for or expressly contemplated paying (large sums) for licenses to use copyrighted works to train their LLMs. Indeed, in an *amicus* brief filed in *Kadrey v. Meta Platforms, Inc.*, No. 3:23-cv-3417 (N.D. Cal.), the Association of American Publishers cited *dozens* of "AI licensing deals for textual works," including deals involving Amazon, Microsoft, OpenAI, and Perplexity.[10] And, as the Court found in that

---

[7] U.S. Copyright Office, *Copyright and Artificial Intelligence, Part 3: Generative AI Training Pre-Publication*, at 9.

[8] *Id.* at 10.

[9] *Id.* at 11.

[10] *Kadrey v. Meta Platforms, Inc.*, ECF 535 at 12, Case No. 3:23-cv-3417-VC (N.D. Cal.) (Apr. 11, 2025).

SECOND AMENDED COMPLAINT

litigation, Meta considered spending up to $100 million to license copyrighted materials in connection with LLM training.[11]

38.    As alleged below, Meta's employees reached the same conclusion as other AI researchers—that published materials, and books in particular, were an essential ingredient for developing a high-performing LLM.

39.    As discussed in the introduction, technology companies have treated generative AI as the next foundational layer of the digital economy. Industry leaders publicly describe an "AI arms race," in which they have redirected their corporate strategies to seize control of what they believe will become a new infrastructure layer for commerce, communication, and knowledge work.[12] For these companies, staying ahead of competitors is "code red."[13] Among other things, being too slow out of the blocks could mean ending up in last place; if by the time you publicly released *your* LLM model, the public writ large and private industry had already adopted *other companies'* models, there would be a real risk that your model would be left on the shelf.

40.    Like other participants in this race, Meta risked falling behind early industry leaders like OpenAI. Indeed, market analysts consistently reported that Meta had, in fact, fallen behind, with many pointing to Meta's intense focus on investment in the "Metaverse."[14]

41.    Faced with the risks outlined above, Meta needed to move fast to develop and roll out Llama, its capstone LLM. And to do that, Meta needed to get its hands on high-quality training data.

---

[11] *Kadrey v. Meta Platforms, Inc.*, 788 F. Supp. 3d 1026, 1040 (N.D. Cal. 2025).

[12] *See* Dr. Peter Asaro, *What is an 'Artificial Intelligence Arms Race' Anyway?*, 15 I/S: J.L. & Pol'y for Info. Soc'y 45 (2019).

[13] *See* Sharon Goldman, *Sam Altman declares 'Code Red' as Google's Gemini surges—three years after ChatGPT cause Google CEO Sundar Pichai to do the same*, FORTUNE (Dec. 2, 2025, 11:43 AM), https://perma.cc/J9MS-UQD2.

[14] Mike Proulx, *Meta: So Long, Metaverse; Hello, Superintelligence*, FORRESTER (July 30, 2025), https://perma.cc/BZ57-CR2D; Karen Hao, et al., *Mark Zuckerberg Was Early in AI. Now Meta Is Trying to Catch Up.*, WALL STREET JOURNAL (June 17, 2023, 12:00 AM), https://perma.cc/G548-B5RD.

### C.    Shadow Libraries, *The Pile*, and Torrenting

42.    For years now, there have been illicit, online marketplaces for digital copies of books. These "shadow libraries," as they are commonly known, systematically acquire, store, index, and disseminate full-fidelity digital copies of copyrighted books. These online repositories maintain searchable catalogs, metadata, mirrors, bulk-download mechanisms, and—critically—complete downloadable archives designed to allow third parties to replicate the entire collection.[15] And they do all of this without authorization from authors or publishers.[16] In short, shadow libraries facilitate the reproduction and distribution of unauthorized copies of copyrighted works at industrial scale.

43.    These libraries are widely known within both piracy communities and the technology sector as illegal sources of copyrighted books. Many have been the subject of criminal prosecutions, civil injunctions, domain seizures, and formal designation as "notorious piracy markets" by United States trade authorities. As centralized shadow libraries increasingly faced enforcement actions, including the seizure of domains, third parties responded by creating full mirrored copies of those repositories for decentralized redistribution.[17]

44.    In 2018, an OpenAI employee downloaded pirated copies of books from Library Genesis, or "LibGen"—a shadow library repeatedly enjoined by federal courts[18]—and used those books to create two internal datasets OpenAI called "LibGen1" and "LibGen2," which OpenAI

---

[15] *See* Letter from Mary E. Rasenberger, CEO, Authors Guild, & Umair Kazi, Dir. of Pol'y & Advocacy, Authors Guild, to Daniel Lee, Assistant U.S. Trade Representative for Innovation & Intellectual Prop., Office of the U.S. Trade Representative (Oct. 7, 2022), https://perma.cc/XM4R-NDN3.

[16] *See* Riddhi Setty, *Rampant 'Shadow Libraries' Drive Calls for Anti-Piracy Action*, BLOOMBERG LAW (Oct. 19, 2022, 9:03 AM), https://perma.cc/F5VH-3BA6; Claire Woodcock, *'Shadow Libraries' Are Moving Their Pirated Books to the Dark Web After Fed Crackdowns*, VICE (Nov. 30, 2022, 11:38 AM), https://perma.cc/K9FA-VLPW.

[17] Woodcock, *'Shadow Libraries' Are Moving Their Pirated Books to the Dark Web After Fed Crackdowns*.

[18] *See Cengage Learning, Inc. et al. v. Does 1-50 d/b/a Library Genesis*, ECF No. 36, Case No. 23-cv-8136 (S.D.N.Y. Sept. 24, 2024).

publicly referred to as "Books1" and "Books2."[19] OpenAI used those pirated corpora to train GPT-3, which it released in June 2020 to widespread commercial acclaim. OpenAI's use of a books corpora from a pirate library established the model for how to quickly and cheaply obtain published materials for use as LLM training data.

45.     Within weeks of GPT-3's release, an open research collective, EleutherAI, formed with the express goal of replicating GPT-3's capabilities and democratizing access to large-scale language modeling. To do so, EleutherAI assembled and publicly released *The Pile*, a large (800+ gigabyte) general-purpose training dataset expressly designed to be downloaded, used, and incorporated into LLMs by academic researchers, startups, and commercial AI developers.[20]

46.     Because OpenAI did not disclose the precise makeup of its training datasets, members of EleutherAI constructed a book corpus of their own: "Books3," consisting of approximately 196,640 books.[21] Books3 comprises about 12 percent (just over 100 gigabytes) of *The Pile*.[22]

47.     EleutherAI and the compiler of Books3, Shawn Presser, have confirmed the genesis of Books3 is the shadow library Bibliotik. Presser has publicly stated that Books3 represents "all of bibliotik,"[23] and an EleutherAI paper likewise confirms that Books3 "is a dataset of books derived from a copy of the contents of the Bibliotik private tracker."[24]

48.     Bibliotik is a private, invitation-only torrent tracker that has long functioned as a centralized source of pirated e-books. The repository, which hosts and distributes hundreds of

---

[19] *In re OpenAI, Inc., Copyright Infringement Litig.*, Case No. 1:2025-md-03143 (S.D.N.Y. 2025), ECF No. 846 at 9; Ashley Belanger, *OpenAI desperate to avoid explaining why it deleted pirated book datasets*, ARSTECHNICA (Dec. 1, 2025), https://perma.cc/9M7K-8DA9.

[20] Leo Gao et al., *The Pile: An 800GB Dataset of Diverse Text for Language Modeling*, arXiv, 1 (2020), https://perma.cc/NHV6-R8YE.

[21] Stella Biderman et al., *Datasheet for the Pile*, arXiv, 8 (2020), https://perma.cc/7KL2-LTLF.

[22] *Id.*

[23] Shawn Presser, X (Oct. 25, 2020 1:32 AM), https://perma.cc/7WRD-NHRX.

[24] Biderman et al., *Datasheet for the Pile*, arXiv, 8.

SECOND AMENDED COMPLAINT

thousands of copyrighted books, is only accessible with the use of torrenting protocols, which are explained below.[25]

49.    Bibliotik has been widely recognized in piracy communities, academic literature, and AI-research documentation as a shadow library devoted to copyrighted books. Unsurprisingly, then, *The Pile*'s datasheet acknowledges that "Books3 is almost entirely comprised of copyrighted works."[26] Bibliotik's illicit nature is no secret—it has been openly discussed for years prior to major tech companies' use of datasets derived directly from it.

50.    In an interview with *The Atlantic*, Presser confirmed that the illuminating purpose behind Books3 was to ensure broad-based access to the tools necessary to create LLMs:

> [Presser] created Books3 in the hope that it would allow any developer to create generative-AI tools. "It would be better if it wasn't necessary to have something like Books3," he said. "But the alternative is that, without Books3, only OpenAI can do what they're doing."[27]

51.    EletheurAI's compilation and distribution of *The Pile* and Books3 provided "off-the-shelf" access to a corpus of infringing works that any AI developer could download and immediately incorporate into a large-scale training pipeline. As a result, Books3's presence within *The Pile* facilitated wide downstream distribution and adoption of a corpus derived from a pirate book library.[28]

52.    Bibliotik is just one of many Internet-based shadow libraries and, as alleged below, Meta relied on more than just *The Pile* in connection with its development of Llama.

---

[25] Ruheni Mathenge, *The 12 Best Private Torrent Sites Still Working in 2026*, PRIVACYSAVVY (last accessed March 9, 2026), https://perma.cc/4V8M-3ALY.

[26] Biderman et al., *Datasheet for the Pile*, arXiv, 8.

[27] Alex Reisner, *Revealed: The Authors Whose Pirated Books Are Powering Generative AI,* THE ATLANTIC (Aug. 19, 2023), https://perma.cc/P25L-S9FC.

[28] *See* Stella Biderman, *The Pile: An 800GB Dataset of Diverse Text for Language Modeling*, ELEUTHERAI (Dec. 31, 2020), https://perma.cc/JGT9-LLTK.

53.    As noted above, OpenAI's developers trained its LLMs on a books corpus derived from LibGen, one of the largest and longest-running shadow libraries in the world. LibGen hosts millions of pirated books, academic texts, and scholarly articles.[29] It operates as a centralized repository offering direct downloads of full-fidelity e-book files. It also distributes its entire database through bulk archives and torrent files, enabling third parties to download and locally host complete copies of its collection.[30] LibGen has been repeatedly enjoined by federal courts for copyright infringement and has been designated a "notorious market" by the United States Trade Representative.[31] Despite enforcement actions, LibGen has remained accessible through shifting domains, mirrors, and downloadable archives. Its persistence is a function of deliberate decentralization designed to evade shutdown.[32]

54.    Z-Library (also known as "B-ok") is another well-known shadow library that emerged as an expanded and user-friendly derivative of LibGen. It incorporated large portions of LibGen's catalog while adding additional titles, metadata, and interface features.[33] Z-Library offered premium features—including faster downloads and higher volume limits—in exchange for payment, operating in effect as a commercial piracy service.[34] In 2022, Z-Library's domains were

---

[29] Office of the U.S. Trade Representative, REVIEW OF NOTORIOUS MARKETS FOR COUNTERFEITING AND PIRACY, 27 (2024),  https://perma.cc/N4WT-AHJ9 ("Libgen … hosts a large number of digital copies of books, manuals, journals, and other works, many of which are unauthorized copies of copyright protected content.").

[30] *See* Letter from Mary E. Rasenberger, CEO, Authors Guild, & Umair Kazi, Dir. of Pol'y & Advocacy, Authors Guild, to Daniel Lee, Assistant U.S. Trade Representative for Innovation & Intellectual Prop., Office of the U.S. Trade Representative at n.5.

[31] *See* Office of the U.S. Trade Representative, 2019 REVIEW OF NOTORIOUS MARKETS FOR COUNTERFEITING AND PIRACY, 27, https://perma.cc/22VN-9VD7.

[32] *See* Andrew Albanese, *Textbook Publishers Sue Notorious 'Shadow Library' Libgen,* PUBLISHERS WEEKLY (Sep. 14, 2023), https://perma.cc/3NPY-UJCX.

[33] Jordana Rosenfeld, *Z-Library*, ENCYCLOPEDIA BRITANNICA (last accessed March 9, 2026), https://perma.cc/4H26-GDCC.

[34] *See* Masood Farivar, *Two Russian Nationals Charged With Operating E-Book Piracy Site*, VOA (Nov. 16, 2022), https://perma.cc/6MPD-QNKB.

14
SECOND AMENDED COMPLAINT

seized by law-enforcement authorities, and its operators were arrested and later indicted for criminal copyright infringement.[35] These actions confirmed what had long been publicly known: Z-Library was an illegal piracy operation. The seizure of Z-Library did not eliminate access to its content. Instead, third parties responded by creating full mirrors of its collection to ensure continued distribution.[36]

55.    Another major player in the shadow library ecosystem is Anna's Archive. Anna's Archive is the most comprehensive and active shadow library currently in operation.[37]

56.    Anna's Archive began in 2022 as "Pirate Library Mirror," initially hosting a mirrored copy of Z-Library. It later rebranded as "Anna's Archive" and expanded to aggregate and host the complete collections of LibGen, Z-Library, and other pirated sources.[38] Anna's Archive functions as a meta-library: it indexes, mirrors, and redistributes multiple shadow libraries simultaneously, offering users unified access to millions of pirated books.[39]

57.    Anna's Archive offers paid tiers that provide high-speed or priority access to its pirated collections.[40] Through its downloadable archives and torrent-based distribution, Anna's Archive enables users to acquire and store local copies of millions of copyrighted books in bulk.[41]

---

[35] Press Release, U.S. Dep't of Justice, U.S. Att'y's Off., E. Dist. of N.Y., *Two Russian Nationals Charged with Running Massive E-Book Piracy Website* (Nov. 16, 2022), https://perma.cc/CR4L-JLA3.

[36] *See* Woodcock, *'Shadow Libraries' Are Moving Their Pirated Books to The Dark Web.*

[37] *See* Soumyajyoti Mukherjee, *Who is Anna's Archive? All we know about pirate activist group behind 300 TB Spotify music library heist*, SOAPCENTRAL.COM (Dec. 24, 2025), https://perma.cc/DC5S-89Z8.

[38] *See* Ernesto Van de Sar, *"Anna's Archive" Opens the Door to Z-Library and Other Pirate Libraries*, TORRENTFREAK (Nov. 19, 2022), https://perma.cc/U88R-WTR4.

[39] *Id.*

[40] *See If you're an LLM, please read this,* ANNA'S ARCHIVE (February 18, 2026), https://perma.cc/989X-GS3Q.

[41] *See* M. Luisa Simpson, *2024 Special 301 Out-of-Cycle Review of Notorious Markets: Request for Comments* ASSOCIATION OF AMERICAN PUBLISHERS (OCTOBER 2, 2024), https://perma.cc/P2E9-MYBY.

58. Although individual domain names may change, Anna's Archive and its underlying datasets remain accessible through mirrors, torrents, and distributed storage systems.

59. According to Anna's Archive, "virtually all major companies building LLMs contacted us to train on our data. . . We have given high-speed access to about 30 companies."[42] Anna's Archive blog stated as recently as February 18, 2026 that if an *LLM was reading its blog* "you have likely been trained in part on our data."[43]

60. Many of these shadow libraries and datasets can be downloaded using "torrent," a file-sharing method used in peer-to-peer networks. Torrenting works by breaking a file into many small pieces and distributing those pieces across a network of participating computers. A user who torrents a shadow-library repository does not receive a single copy from a single source; rather, the user downloads portions of the library from numerous other computers that already possess the copyrighted books. Torrent software then reassembles those pieces into a complete library on the user's machine. Torrenting protocols, including BitTorrent, are often configured by default to *reupload* pieces of the copyrighted files to others on the network both during download ("leeching") and after download is complete ("seeding"). This means that each participant in the torrent both copies *and redistributes* the copyrighted works. By obtaining copyrighted materials through this leech-and-seed process, a user may make multiple unauthorized reproductions of, and engage in numerous distributions of, the copyrighted materials.

**D.    Meta's Deliberate Use of Pirated Datasets to Train the Llama Family of Models**

61. As noted above, Meta develops and distributes the Llama series of LLMs, including Llama 1, Llama 2, Llama 3, and Llama 4. Meta has "invested billions of dollars to develop its generative AI offerings,"[44] and it in turn expects Llama to generate somewhere in the realm of $460

---

[42] *See Copyright reform is necessary for national security,* ANNA'S ARCHIVE (Jan. 31, 2025), https://perma.cc/3RVZ-6G5B.

[43] *See If you're an LLM, please read this,* ANNA'S ARCHIVE (Feb. 18, 2026), https://perma.cc/MJ7Z-3ZCL.

[44] *Cambronne Inc., et al. v. Anthropic PBC, et al.*, Case No. 5:2025-cv-10897-PCP (N.D. Cal.), ECF No. 109 at ¶ 40 (Meta's Answer).

billion to $1.4 trillion in revenue.[45] None of the money that Meta invested into the development of its Llama models was used to pay for Plaintiffs' copyrighted works.[46]

62.     Meta released the first of its Llama models, Llama 1, in February 2023.

63.     In connection with the development of Llama, Meta viewed book-corpora as among its most valuable sources of training data. Llama's design goal was to emit particularly creative and expressive language, leveraging Meta's consumer platforms to "connect" with users through text.[47] To accomplish that, Meta needed to train on large quantities of high-quality books and other published materials.

64.     Meta employees repeatedly acknowledged the importance of books as training data. Specifically, they acknowledged it was "really important for [Meta] to get books data ASAP," and the "best resources [Meta] [could] think of are definitely books."[48]

65.     Prior to the release of Llama 1, Meta downloaded copyrighted works from LibGen. As recognized in *Kadrey v. Meta Platforms, Inc.*, Meta first downloaded LibGen in 2022 "to investigate whether there was value in training Llama on the works it contained. If the answer was yes, the plan was to then set up licensing agreements for those or similar works."[49]

66.     At the time Meta downloaded LibGen, it knew or should have known that LibGen was a repository of unauthorized copies of copyrighted works.

67.     Ultimately, Meta decided not to use its pirated LibGen content in connection with the training of Llama 1. It did, however, rely on another dataset of pirated works—Books3—in training Llama 1.

---

[45] *See Kadrey v. Meta Platforms, Inc.*, 788 F. Supp. 3d 1026, 1040 (N.D. Cal. 2025).

[46] *Cambronne*, ECF No. 109 at ¶¶ 2, 9, 42, 89 (admitting in *Cambronne* that "it did not obtain a license or pay for the use of [copyrighted] works").

[47] Jon Russell, *Mark Zuckerberg Announces New Team at Meta Working on A.I. Products for Instagram, WhatsApp*, CNBC (Feb. 27, 2023), https://perma.cc/JKE9-N4T7 ("Zuckerberg said that the team would build 'creative and expressive' tools to be used inside Meta's products.").

[48] *Kadrey*, 788 F. Supp. 3d at 1040.

[49] *Id.*

68.    In connection with Llama 1's release, Meta disclosed the composition of the model's "pre-training data."[50] Among the datasets used to train Llama 1 were "two book corpora," including "the Books3 section of ThePile."[51] In their research paper, Meta's developers described Books3 as "a publicly available dataset for training large language models," which they distinguished from the other book corpus it used, which they described as being in the "pubic domain."[52] This distinction was deliberate and notable, as Meta *knew* that Books3 was *not* a corpus of books in the "public domain."

69.    Among the other datasets used by Meta to train Llama 1 were "five CommonCrawl dumps, ranging from 2017 to 2020," comprising 67 percent of the overall data mix, and "the publicly available C4 dataset," comprising 15 percent of the data mix.[53] "CommonCrawl is a publicly-available web archive that provides 'web extracted text' by removing markup and other non-text content from the scraped HTML files. This process produces around 20TB of scraped data per month."[54] The C4 dataset itself is derived from CommonCrawl.[55] In short, a massive amount (and the majority) of data used by Meta to train Llama was "scraped" from the Internet.

70.    As alluded to above, Meta at one time had a "plan . . . to then set up licensing agreements" to obtain the copyrighted materials it wanted for use in training its AI models.[56] But this idea was short-lived. "[I]n spring 2023, after failing to acquire licenses and following

---

[50] Hugo Touvron et al., *LLaMA: Open and Efficient Foundation Language Models*, arXiv, 2 (2023), https://perma.cc/LB97-ZK2C.

[51] *Id.*

[52] *Id.*

[53] Touvron et al., *LLaMA: Open and Efficient Foundation Language Models*, arXiv, 2.

[54] Colin Raffel et al., *Exploring the Limits of Transfer Learning with a Unified Text-to-Text Transformer*, Journal of Machine Learning Research 21, 7 (2020), https://perma.cc/A4VM-V8XR.

[55] *Id.*

[56] *Kadrey*, 788 F. Supp. 3d at 1040; *see also Cambronne*, ECF No. 109 at ¶ 88 (Meta admitting that "it contacted certain publishers" and "internally discussed licensing certain types of data to train its Llama models").

escalations to CEO Mark Zuckerberg, Meta decided to just use the works acquired from LibGen as training data."[57]

71.     Done with the idea of paying for licenses to use copyrighted materials, Meta pivoted to shadow libraries and web crawlers to obtain the training data it wanted. Meta turned to shadow libraries knowing that these were just that—repositories of unauthorized copies of copyrighted works.

72.     "In early 2024, Meta also downloaded Anna's Archive, a compilation of shadow libraries including LibGen, Z-Library, and others."[58]

73.     Meta likewise downloaded copyrighted materials from Z-Library, Sci-Hub, and other shadow libraries.[59] Indeed, by April 2024, Meta had downloaded over 25 TB of data from Z-Library and 10 TB of data from LibGen.[60]

74.     To obtain the massive quantities of data from these shadow libraries, Meta used torrenting protocols.[61] In using these protocols to obtain data from these shadow libraries, Meta reuploaded (and distributed) to peer-to-peer networks at least some of the copyrighted materials it had downloaded, whether through "leeching" or by "seeding."[62]

75.     By uploading and distributing copyrighted materials on peer-to-peer sharing networks, Meta made those materials available for download to other third parties whose

---

[57] *Id.* at 1041.

[58] *Kadrey*, 788 F. Supp. 3d at 1041.

[59] *Cambronne*, ECF 109 (Meta Answer), ¶ 83.

[60] *Kadrey*, ECF No. 472 (Pls.' Partial Mot. for Summ. J.), at 11.

[61] *Cambronne*, ECF No. 109 at ¶ 83 (admitting that "it used BitTorrent to download certain portions of these publicly available datasets").

[62] *See Kadrey*, 788 F. Supp. 3d at 1041 ("To download these large datasets more quickly and without unnecessarily slowing down its networks, Meta torrented them. . . . There is no dispute that Meta torrented LibGen and Anna's Archive, but the parties dispute whether and to what extent Meta uploaded (via leeching or seeding) the data it torrented. A Meta engineer involved in the torrenting wrote a script to prevent seeding, but apparently not leeching.").

downloading and redistribution of copyrighted materials would constitute further infringement of the copyrighted materials.

76. There was no substantial or commercially significant non-infringing use of the copyrighted materials that Meta uploaded and distributed. Similarly, there was no substantial or commercially significant non-infringing use of Meta's uploading and redistribution of these materials.

77. In torrenting from shadow libraries, Meta knew or should have known that it was participating in a *peer-to-peer network that traded in unauthorized copies of copyrighted material*. Stated differently, Meta knew or should have known that it was facilitating further copyright infringement by making available to others on the peer-to-peer network unauthorized copies of copyrighted materials.

78. In connection with the development of Llama, certain Meta employees questioned, implicitly or explicitly, the legal or ethical implications of relying on copyrighted content, content from shadow libraries, and torrenting protocols. On information and belief, certain employes implicitly or explicitly raised concerns with training Llama on "pirated" content. On information and belief, certain employees implicitly or explicitly raised concerns with obtaining copyrighted materials from shadow libraries. And on information and belief, certain employees implicitly or explicitly raised concerns with torrenting from shadow libraries.

79. Notwithstanding what it knew about these peer-to-peer networks and concerns raised by employees, Meta torrented large quantities of data from these shadow libraries, including but not limited to terabytes of data from each of Anna's Archive and LibGen.

80. Meta continued to download from these shadow libraries even after it had been sued for copyright infringement based on its use of copyrighted works to train Llama.

81. Meta also relied on web crawlers to obtain massive amounts of Internet data for use in training Llama. On information and belief, the web crawler data that Meta obtained in connection with its Llama training contained copyrighted materials.

82. Upon downloading this material, Meta manipulated the downloaded data. Among other things, Meta processed the data, and in doing so, removed and altered certain text and

information, including titles, author information, information about the copyright owner, and copyright notices. When it removed this information, Meta did so without the authority of the copyright owners.

83.    As Meta has admitted elsewhere, Meta "created a script to remove repetitive text from the training data for its Llama models."[63] As admitted elsewhere, Meta's "program was designed to remove lines that contain the word 'copyright.'"[64]

84.    As alleged above, the Plaintiffs' Works appear in various shadow libraries and/or pirated datasets, including Books3, LibGen, Anna's Archive, and Z-Library. As such, there is a reasonable inference that Meta downloaded, manipulated, reproduced, and distributed the Plaintiffs' Works.

85.    As admitted elsewhere, Meta used at least Books3 and data it obtained from LibGen and Z-Library to train the Llama family of models.[65] On information and belief, it also used data it obtained from Anna's Archive and other shadow libraries to train the Llama family of models. After Llama 1, Meta stopped disclosing detailed information about the datasets that its models were trained on. Meta did this, in part, to conceal the fact that it had relied on and was relying on pirated materials to train Llama.

86.    On information and belief, Meta, like Anthropic, downloaded, maintained, and retained pirated copies of works that were not specifically tied to training its LLM models.[66]

87.    Meta has incorporated Llama into several of its consumer-facing products, including Facebook, Instagram, and WhatsApp. And although Meta has offered free downloads of various versions of Llama, it considers or has considered Llama and the technology underpinning it to be

[63] *Kadrey*, ECF 485, ¶ 88 (Meta's Answer to Third Am. Compl.).

[64] *Kadrey*, ECF 485, ¶ 89.

[65] *Cambronne*, ECF 109, ¶ 2 (Meta's Answer, admitting that "it obtained publicly available data from sources such as LibGen and Z-Library, portions of which were utilized to research, develop, and train its Llama models").

[66] *Bartz v. Anthropic PBC*, 787 F. Supp. 3d 1007, 1014 (N.D. Cal. 2025) (Anthropic's amassing of " a central library").

an important part of its commercial success. In other words, Meta hopes and expects that its development of Llama will contribute to its current and future financial success.

### E. Meta's Conduct Harms the Market for Plaintiffs' Copyrighted Materials

88. Meta's conduct has a detrimental effect on the potential market for and value of Plaintiffs' works, including by, among other things, developing products that create and are capable of creating content which serves as a direct substitute for Plaintiffs' works, developing products that create content and are capable of creating content which serves as indirect substitutes for Plaintiffs' works, and undermining Plaintiffs' ability to participate in and profit from the market for licensing their works for the purpose of training LLMs.

89. *First*, Meta's decision to download and use unauthorized copies of Plaintiffs' works from shadow libraries deprived Plaintiffs of revenue in the form of licensing fees that they would have otherwise earned. As alleged herein, there is an existing market for licensing copyrighted materials such as Plaintiffs', including for use in the development of LLMs. Meta bypassed that market, and in doing so, deprived Plaintiffs of licensing revenue they would have earned. Meta now allows users in certain markets to opt out of having their data used to train its AI models, but it deprived Plaintiffs and many others of that choice. Meta's misconduct undermined Plaintiffs and many others, eliminating the bargaining power they should have had, and otherwise would have had, with respect to licensing terms for the use Meta made of their works.

90. *Second*, Llama, trained on Plaintiffs' copyrighted materials (and the protected works of others), is capable of generating outputs that compete directly with, and risk serving as replacements for, Plaintiffs' works. As the U.S. Copyright Office has warned, "the speed and scale at which AI systems generate content pose a serious risk of diluting markets for works of the same kind as in their training data."[67]

91. *Third*, even if Llama models are restricted from outputting extended portions of verbatim text from copyrighted works, they are nevertheless capable of producing nearly

---

[67] U.S. Copyright Office, *Copyright and Artificial Intelligence, Part 3: Generative AI Training Pre-Publication*, at 65.

indistinguishable "versions" of copyrighted works such that a consumer would use the AI-generated version of the material rather than pay for a copy of the actual copyrighted work.

## V.    CLAIMS FOR RELIEF

### COUNT I

### Direct Copyright Infringement (17 U.S.C. § 501)

92.    Plaintiffs incorporate the allegations above.

93.    Plaintiffs are the legal or beneficial owners of the copyrighted works listed in Exhibit A (referred to herein as the Plaintiffs' Works).

94.    Defendant, without authorization from Plaintiffs, copied, downloaded, reproduced, ingested, parsed, embedded, and used pirated copies of Plaintiffs' works in the development, training, fine-tuning, and deployment of its Llama family of models. These acts violated Plaintiffs' exclusive rights under 17 U.S.C. § 106.

95.    Defendant's infringement occurred repeatedly throughout the lifecycle of its AI-model development. As alleged above, Defendant:

- acquired Plaintiffs' works from shadow-library repositories and datasets containing pirated works from shadow libraries;

- distributed Plaintiffs' works through the use of torrenting software, programs, or protocols;

- reproduced additional copies during ingestion, preprocessing, storage, deduplication, formatting, and/or tokenization; and

- while training its models, made even more copies of the text—because every training pass (each epoch and each step of gradient descent) automatically requires creating and working with fresh versions of that text.

96.    Defendant's reproductions and distributions of Plaintiffs' copyrighted works were made without permission, license, or consent and violated Plaintiffs' exclusive rights under the Copyright Act.

97.    Defendant's infringement was **willful**. As alleged above, Defendant knowingly trained its models on and/or optimized its product with datasets saturated with pirated books,

including Plaintiffs' works; relied on shadow-library corpora it knew to be illegal; ignored internal and external warnings; attempted to conceal the composition of its training datasets; and continued copying after public reports, lawsuits, law-enforcement seizures, cease-and-desist notices, and industry-wide alerts made the illegality unmistakable.

98.    Upon information and belief, Defendant has made and will continue to make substantial profits and gains to which it is not in law or in equity entitled.

99.    Plaintiffs have been injured by Defendant's willful acts of copyright infringement. Plaintiffs are entitled to statutory damages, actual damages, restitution of profits, and/or other remedies in law or equity.

100.    Plaintiffs are entitled to recover attorneys' fees and costs under 17 U.S.C. § 505.

## COUNT II

### Contributory Copyright Infringement (17 U.S.C. § 501)

101.    Plaintiffs incorporate the allegations above.

102.    Defendant used torrenting software, programs, or protocols to download datasets containing pirated copies of works, including the Plaintiffs' Works.

103.    In connection with its torrenting of datasets that contained copyrighted works, Defendant uploaded and distributed, either through "seeding" and/or "leeching," copyrighted materials, including the Plaintiffs' Works, thereby making those works available to third parties for downloading on peer-to-peer networks.

104.    Defendant knowingly participated in peer-to-peer sharing networks that it knew trafficked in pirated copies of copyrighted materials. In other words, Defendant knew that others on these networks were infringing copyrighted materials through reproduction and/or distribution. There was no substantial or commercially significant non-infringing use of the copyrighted materials that Meta uploaded and distributed. Nor was there substantial or commercially significant non-infringing use of Defendant's uploading and distribution of Plaintiffs' copyrighted works. By participating in these networks, and by further uploading and distributing Plaintiffs' copyrighted works, Defendant materially contributed to and induced further infringement of Plaintiffs' works.

SECOND AMENDED COMPLAINT

105.   By knowingly inducing and materially contributing to others' infringement of Plaintiffs' works, Defendant is liable for contributory copyright infringement.

106.   As a direct and proximate cause of Defendant's conduct, Plaintiffs were injured and are entitled to statutory damages, actual damages, restitution of profits, and/or other remedies in law or equity.

107.   Plaintiffs are entitled to recover attorneys' fees and costs under 17 U.S.C. § 505.

## COUNT III

### Removal of Copyright Management Information (17 U.S.C. § 1202(b)(1))

108.   Plaintiffs incorporate the allegations above.

109.   Plaintiffs' works contain information that constitutes "copyright management information" as that term is defined in 17 U.S.C. § 1202(c). This includes but is not limited to author information, information about the copyright owner, and copyright notices.

110.   Upon downloading copyrighted materials, including Plaintiffs' works, Defendant processed the data, and in doing so, removed and altered certain text and information, including copyright management information found in and on Plaintiffs' works. When it removed this information, Defendant did so without the authority of the copyright owners.

111.   Defendant's removal of the copyright management information was intentional—it did so to, among other things, create high-quality LLM training data and, through the creation and use of high-quality training data, ultimately create high-quality LLM models.

112.   Defendant removed copyright management information from Plaintiffs' works knowing or having reasonable grounds to believe that it was enabling, facilitating, and concealing acts of copyright infringement. As to concealment, Defendant knew or had reasonable grounds to believe that by stripping copyrighted works of copyright management information it would be harder for others to discover the true sources—*e.g.*, copyrighted works—of Defendant's training data.

113.   Plaintiffs were harmed by Defendant's removal of copyright management information from its works and is entitled to statutory damages, actual damages, restitution of

profits, and other remedies provided by law. Plaintiffs are entitled to recover attorneys' fees and costs under 17 U.S.C. § 1203(b)(5).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request that the Court enter judgment on their behalf by ordering:

    a.   Judgment in favor of Plaintiffs against the Defendant;

    b.   A declaration that the Defendant has infringed Plaintiffs' exclusive copyrights under the Copyright Act;

    c.   A declaration that such infringement is willful;

    d.   A declaration that Defendant violated 17 U.S.C. § 1202(b) through its removal of copyright management information;

    e.   A permanent injunction enjoining the Defendant and all those acting in concert with it from engaging in the infringing conduct alleged herein;

    f.   That the Defendant be directed to account to Plaintiffs for all gains, profits, and advantages derived from their unlawful acts;

    g.   An award of statutory damages under the Copyright Act;

    h.   An award of statutory or actual damages under 17 U.S.C. § 1203(c);

    i.   An award of restitution, disgorgement, costs, expenses, and attorneys' fees as permitted by law (including those allowable under 17 U.S.C. § 505 and/or 17 U.S.C. § 1203(b)(4)–(5)).

    j.   Pre- and post-judgment interest on the damages awarded to Plaintiffs; and

    k.   Further relief for Plaintiffs as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Under Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury.

Dated:  June 5, 2026

Respectfully submitted,

*/s/ Elizabeth Brannen*

Elizabeth Brannen (SBN 226234)
John Stokes (SBN 310847)
Lauren Martin (SBN 294367)
**STRIS & MAHER LLP**
17785 Center Court Dr N, Ste 600
Cerritos, CA 90703
T: (213) 995-6800
F: (213) 261-0299
ebrannen@stris.com
jstokes@stris.com
lmartin@stris.com

Bridget Asay (*pro hac vice*)
15 East State Street, Suite 2
Montpelier, VT 05602
T: (802) 858-4285
basay@stris.com

Christopher M. Rigali (*pro hac vice*)
Jacqueline Sahlberg (*pro hac vice*)
1717 K St NW Ste 900
Washington, DC 20006
Phone: (202) 800-5749
crigali@stris.com
jsahlberg@stris.com

Kyle Roche (*pro hac vice*)
Devin (Velvel) Freedman (*pro hac vice*)
Alex Potter (*pro hac vice*)
**FREEDMAN NORMAND FRIEDLAND LLP**
155 E. 44th Street, Ste 915
New York NY 10017
T: (646) 494-2900
vel@fnf.law
kroche@fnf.law
apotter@fnf.law

*Counsel for Plaintiffs*

27
SECOND AMENDED COMPLAINT